Good morning, Your Honors. May it please the Court, Nicholas D'Angelo on behalf of the appellant Colleen Lehr. I'd like to reserve four minutes for rebuttal and I'll watch my clock. Thank you, Judge. This appeal involves a straightforward application of well-established summary judgment principles. The Court below erred when it determined, as a matter of law, that the reimbursed funds to Perri Electric, totaling $326,000, need not be considered plan assets, because at a minimum that represents a genuine issue of material fact. This Court should reverse. In addition to that issue, we've identified in our papers two other genuine issues in this case. The second is whether Perri Electric or Frank Perri Sr. breached fiduciary duties in not remitting those funds. And the third is whether Ms. Lehr has a vested interest of $79,000 in the plan. But if we turn to the first issue, which is whether the $326,000 constitutes plan assets, it's important to remember that through multiple litigations in multiple courts over multiple years, there was always a purpose to the number 326-846. And the purpose was that it represented what had been wrongfully taken from the ERISA retirement plan. That number, though, is just based on Ms. Lehr's fraudulent misrepresentation on the form 5500, is it not? Correct. And has she ever actually stated, that's exactly the amount that I took from the plan? As the Bankruptcy Court determined below, it's hard to determine exactly what was in the plan. Right, but she's never made an accounting and said that number is actually the amount that I took from the plan. I don't believe so, Judge. Okay. And on summary judgment, it was her burden to establish standing, is that correct? Correct. And she was a party to the criminal proceeding where that restitution payment came from. Is there any evidence in the record that actually shows that the judge in the criminal proceeding determined that that money should go to the plan? Yes, Judge, and it's all because it's all related. I know you make an argument based on the criminal judgment, but the criminal judgment identifies only perielectric. So do you, is there any other, was there, I know there was supposed to be a report identifying the victims of the crime. The crime at issue was the fraud, not the embezzlement. So is there anything, did your client put anything into the record from the criminal proceedings other than the criminal judgment to support her contention that that money was actually supposed to go to the plan? Well, I think you have to look at the indictment itself, Judge, because this is all related to the crime of falsifying ERISA documents. And so it has nothing to do with the other money that may be related to the embezzlement from perielectric. It has to do with the money that was embezzled from the plan itself. And that's why it's reflected in the United States proof of claim in the bankruptcy proceeding where they sought the same exact fund, the $326,000 related to the plan assets. Counsel, you would agree that the district court's restitution discussion in the judgment could have said for reimbursement to the plan, right? Correct. And it also could have said when it's talking about the peri-entity, it could have used the term more definitive than payee, right? Yes. And it didn't do either of those things, right? Correct. So the judgment could have made clear one way or another, should it go to the plan, does the company have unfettered discretion as to what to do with the money, right? Yes. Okay. So you're saying there is a disputed material issue of fact. Correct. And would the trier of fact be interpreting, be determining what was in the mind of the district judge when he wrote the judgment? What would that instruction look like, ladies and gentlemen of the jury? You have to decide what the drafter of the document meant when he wrote these words, or is it something else? That's a good question, Judge, and no. I mean, we're not going to suggest that there's writing that. And there could be many things that would make this clear. If the trustee had written the check to the plan instead of Peri-Electric, that would have made it clear. But what the disputed fact is, is whether or not this is a plan asset. And so what the Isn't that settled by the bankruptcy court? I mean, I looked through this in the bankruptcy lens, and the judgment says the money's paid to Peri-Electric. And it's black-letter bankruptcy law that when you pay the debtor doesn't get control to control how the creditor allocates the payment. And that's true whether you're saying, but the arguments have been made, for example, that the creditor should have allocated to non-dischargeable debt or dischargeable debt. I think, doesn't it? I think that, to me, the criminal judgment is somewhat collateral to what happened in bankruptcy court. And your client could have said, please direct this to the plan, but didn't. She signed off on a settlement that said it goes to Peri-Electric. Well, you're absolutely right, Judge, that the criminal proceeding is directly related to the bankruptcy proceeding. And the proof of claim that the United States filed mirrored what was occurring in the criminal proceeding. And so it's all interrelated on that point. But how do you get over the fact that the bankruptcy law says the debtor doesn't get to allocate, can't force the creditor to allocate payment if there are multiple claims? I think that's correct generally. I think we need to look more specifically at what ERISA requires. And if you look at what the congressional concern was in drafting ERISA, it was to prevent the misuse and mismanagement of plan assets. And that has to do with commingling the plan funds. So when you have a proof of claim in the bankruptcy proceeding that is directly related to the money that was represented to have been in the plan funds, and then those funds are restituted, it can't be Peri-Electric's idea or decision on where those funds should then go. Let me ask you this then. That goes to your theory of fiduciary duty. It has nothing really to do with bankruptcy. I just, in looking at the bankruptcy judgment, which is raised judicata, it just says pay it to Peri-Electric. Right. Okay. And that could bring up another issue, Judge. If Peri-Electric is acting as a fiduciary and the check gets written to Peri-Electric, it really doesn't matter. If they're a fiduciary actor with control over the funds of the plan and they get the check, they can't then just decide that it's going to be put into a general business expense. Well, it can if it's an interim payment, I think. And let me ask you this, and I know you're pro bono counsel, and is there an anticipation of a second payment of restitution? Well, I don't know, Judge. And I think it's important also to note that in the record the $326,000 isn't the only payment that has been given. There's another $150,000 payment that after the embezzlement was first discovered in 2007, that was written and turned over to Peri-Electric. I don't want to interrupt your argument any further. No, this is why I'm here, Judge, to answer your question. So thank you. If I can just get back to Judge Bennett's question quickly on what this actually would look like. I think it's important to look at this Court's decision in Acosta versus Pacific Enterprises, which there's two questions that are relevant to that. The first is whether the fiduciary actor took what would be the plan assets. And the second is if that is then at the expense of the beneficiaries or participants. So to answer your question, Judge Bennett, that is what a trier of fact would look like. But that whole argument turns on the premise that the judge in the criminal proceeding actually intended that payment to go to the plan. And all we have is a criminal judgment that says the payee is Peri-Electric. And it seems to me if the judge in that proceeding actually intended the money to go to the plan, there would be some record of that from the criminal proceeding that we wouldn't need to call the judge to testify, but he would have said that from the bench, it would have been reflected in the MVRA report, something saying I intend this, I identify the plan as the victim here, this money is supposed to be restoring the plan, and I'm going to assign, you know, the payee to be Peri-Electric as the fiduciary of the plan or as the trustee of the plan or whatever. But we don't have any of that evidence. Wasn't it your client's verdict? She was the party to the criminal proceeding. Why isn't any of that in the record? Well, I think you need to look at, again, the indictment, and that's what a trier of fact would look like. Look at what is the actual crime that the restitution is related to, and then when it's going to be restituted, who's the victim of that crime? So in this case, it's not embezzlement, it's fraud. Correct. And it was fraud on a form that Peri-Electric was legally obligated to submit and maintain. And arguably, Peri-Electric was the victim of that crime, because Peri-Electric was the one who, you know, submitted a false form and then also wasn't aware of Ms. Laird's embezzlement because of the misrepresentation that she made on the form. They could be the victim of the crime or a participant in the crime if they also submitted the form. That's not really what occurred. Right. But your whole argument assumes that the only victim is the plan. If this was an embezzlement case, that might — if this case was about the embezzlement from the plan, that might make more sense. But the government brought the fraud case, and that opens up Peri-Electric as the victim of that crime. Related, though, Judge, to what the restitution number is actually going to be, that has to do with the proof of claim and what the — what the Form 550 said. And so all of this is not damages or restitution related to something else in the fraud. It all has to do with what was taken from the plan. And I read that as I'm saying, we don't actually know what the damages were. It seems fair to use this number that she made up on the form. Right. So it's not — to me, it doesn't seem like — it seems like a case in which they knew there was a fact of damage, but they didn't have an actual measure of damages. So they used the number she put on the form as a proxy. But I don't see any showing that that number actually reflects an actual accounting of what she took. Well, in the — if you look at the expert reports, too, and the adversarial proceeding, both the Gilbert report and the Garolfo report, they do do a forensic accounting and get to that number. The 326 number? The 326 number. And so your view is that if there is some ambiguity there about whether 326 is exactly right from what was taken from the plan or too high or too low, that is a disputed material issue of fact. And whether or not that then, applying the factual inquiry that Acosta lays out, whether that number is a plan asset. And that's looking at the proof of claim, looking at the expert report, weighing the evidence and weighing the credibility, that's what a jury would have to decide here. And we've cited cases, other district court cases, applying Acosta that deny summary judgment on that very issue, recognizing the mixed question of fact and law on that topic. You want to reserve? Yes, please, Judge. Thank you. Good morning, Your Honors. May it please the Court. My name is Eric Larson. I'm with the Spencer T. Melissiak Law Corporation. I'm appearing on behalf of PERI Electric, Inc. and Frank M. PERI. I did want, just as a starting point, I wanted to kind of briefly address one issue that you just addressed with opposing counsel. He indicated that the Gilbert report that was filed in the connection with the motion for summary judgment reached the 326-826 figure. That's not correct. Mr. Gilbert actually ran the numbers and calculated that the damages were roughly $649,000 factoring. Additionally, Carol PERI filed a declaration in support of the motion for summary judgment, which indicated that as of 1999, a form was filed indicating that the planned assets at that time were $561,000 and changing. There was no court finding as to what the actual number was, correct? Just so, Your Honor. And to your point, I mean, this is, they used this one form that was admittedly false, prepared by Ms. Slayer, you know, as basically as a deemed admission, because no one knows exactly how much was taken out of the plan, you know. And as a result, I think that that's a huge problem for her, because I think, you know, because she cannot establish what was taken out of the plan, by virtue of that, she can't establish also what, you know, her account balance would be, you know. And this is kind of leads back to which is a central issue of the case is basically standing, Your Honor. I mean, so, you know, to establish standing, I mean, she has to show that she's a planned participant as of the date that the complaint was filed. And to do that, you know, I mean, basically she has to, you know, show a colorable claim for benefits. And under that Parker B. Bain case, you know, if you've taken out of the plan more than you're entitled to receive from the plan, your status terminates as of that date. Now, we don't know exactly when that happened here, but we do know that according to the plea, the plan was basically empty as of 2003. So as of that date, I think she'd already terminated. Counsel, in your brief, you noted that she didn't point to, Ms. Slayer didn't point to any authority in her brief that once extinguished, her interest could actually be restored. Then you spent most of your briefing on the question of she didn't prove that she had restored it. But do you, are you conceding that it's possible to restore, or are you arguing that under Parker there's not even a legal opportunity to restore interest? I don't believe there's any legal authority for the restoration or resurrection of status as a planned participant years after the fact. And I think that by virtue of the, I think one of the main issues here is we can't, well specifically in this case, the issue is we don't even know what the damages were. You know, so even if we could put a point up, you know, even determine that amount, I think there's an issue too just where whether that restitution will actually make the parties whole just because, you know, if I take money from you in say 2003 and return it in 2015, those aren't equivalent, those aren't equivalent things. I mean, we have inflation, we have the time value of money, we have what could have been used with that money over that time. And I think it's just, you know, I think it's, in this case, it's sort of self-serving to allow Ms. Laird, who prepared the fraudulent report, to basically say, well, I prepared this false document and now we should all kind of assume that it's correct and act accordingly. Has any of the money that has been paid been returned to the plan? No. So everything was used for general expenses, zero was put in the plan? That's correct, Your Honor. And to be clear, so the unsecured or the judgment against Ms. Laird was for $1.25 million and change. The only payment that has been made back to Perry Electric has been by virtue of the payment that was made through the adversary proceeding against her husband, you know, which was, you know, that $326 payment. Putting aside whether or not, when we're obviously looking at that, whether or not the appellant has an interest in the plan, who else has an interest in the plan? At this point, I believe the only, well, I don't think, at this point the plan's empty. Right, but if... How many plan participants are there? Oh, at this point, I think, well, the corporation is dissolved, Your Honor, so I mean, you know, so at this point, I think the plan has been basically, you know, sitting stale. Right, but I mean, at the time, during the relevant period, how many plan participants were there? I, well, I believe my co-counsel might be able to kind of confirm that for you, but I believe that at this point, the only plan participant is Frank M. Perry because there were, I think, five participants, the two parents, both are deceased now, and then the two children, my client, Frank M. Perry and Ms. Lair, and then I think there was an uncle, so... That was my impression, that it was a fairly low number. It's a closely held business, Your Honor, a family business. Closely held business, family members plus Ms. Lair, basically. Yeah, and I think that's, you know, that's some of the reason that allowed this to go on for so long is... Well, Ms. Lair was a family member, too. Yeah, exactly. And, you know, she... Right, but I mean, I think the point that bears repeating, though, too, is that, I mean, if there is a judgment against one point for, you know, $1.2 million, you know, the only payment that's gone back is this $326,000 payment. At this point, you know, that $900,000, you know, balance of the judgment remains unpaid, you know, and there's been no effort by Ms. Lair to pay that, you know, in the interim, So, you know, I think we're faced with a situation where I simply... I think in order to, you know, establish herself as a plan participant, she needs to show, you know, how much she embezzled from the plan, you know, what her account balance would be in the absence of any such embezzlement, and which number is larger. And I don't think she... I think she... I can't think she can do any one of those three things. As a result, I think she can't establish herself as a plan participant, so I think that's the end of the case right there. I mean, because she doesn't have standing. And her husband's standing is, you know, basically linked to her own, since he's... So, you know, if her standing falls, so does his. So... Okay. All right. And then I think the other thing that was other addressed by the opposing counsel was just the virtue of whether the payment was a plan asset, but, you know, again, as you've noted before, I mean, the check was made payable to the corporation, the bankruptcy order indicated the corporation, the criminal judgment indicated the corporation, and, you know, Ms. Lair and our counsel were involved in all of those things. They either had a chance to weigh in when those orders were being drafted, and if they had any objection to them, you know, once they were entered, I mean, they could have, you know, sought an amendment or revision of the order at that time. They didn't do any of the case. So I think to come back to this... the entity as payee automatically means unambiguously that the payee can use the monies for anything it wants, irrespective of whether it has fiduciary responsibilities to a plan. Well, I think that... I think if the payment... If the check and the order and all of the orders indicate that the payee is the corporation, then yes, if the payment is made to the corporation, then the, you know, the officers of the corporation have the discretion to... So the word payee equals unambiguously unfettered discretion. In this case, I think it does, Your Honor, just because, I mean, if there was an indication to have these funds that were returned specifically allocated to the plan, it would have been easy enough in one of these orders to indicate that intention, and there's just... It's not anywhere. I mean, it's not in the criminal plea. It's not in the bankruptcy order. It's not on the check. I mean, there's no... And there were many opportunities to make that clear if that was the intention, and I just don't think that that... There's any evidence that that was the intention in this case. This was sort of a theory, I think, that was developed after the fact, and, you know... Well, I mean, the payee may not be definitive, but the judgments are, wouldn't you agree? And if the judgments are in favor of peri-election, or direct payments to peri-election? I think that's exactly correct, Your Honor, and, again, I just think it's... You know, if there was an intention for it to be otherwise, I mean, that would have been easy enough for somebody along the line to make clear. And then, finally, I think just the third issue was just the fiduciary duty to remit. I mean, I think that was briefly addressed by your last question, Your Honor. It's just that, you know, I think if the payment was made to, you know, peri-electric, you know, I think basically they're wearing their corporate hat at that point. They're not wearing their fiduciary hat, and as a result, they really don't have the discretion to put those funds in the plan, even if they wanted to. I mean, it's just sort of the... It's sort of their... They get to decide what to do, you know, with those funds at that time. So... Well, the plan may have... I mean, if it... The plan may have had a cause of action at that point, correct? I think that's correct, Your Honor. But I think, also, I think it's important to note that if, you know, if the balance of the judgment had been paid, this is all a moot issue. You know, I mean, if the judgment of 1.25 is paid in full, then at some point, those funds would have gone... You know, some portion of that payment would have gone back to satisfy the portion of damages suffered by the plan. And I think Judge Shub and the District Court correctly noted that this is... You know, this was an interim payment, and this wasn't... It wasn't anticipated that this was going to be the final payment. It turned out to be. But that, you know... So I don't think that there's this necessity that that first payment had to go to the plan. And that bankruptcy was otherwise a no-asset bankruptcy? I believe so, Your Honor. I can't say that for a fact. Yeah. Well, unless Your Honors have any other questions for me, I think I'll just relinquish the rest of my time and pass it over to Michael Kouncil. No, thank you. Thank you, Your Honors.  Mr. Scalia?  Good morning, Your Honor. Okay, good. I thought you were muted for a minute. Go ahead. That's okay. Joseph Scalia, appearing on behalf of the defendants in Appellee's perielectric profit-sharing plan and perielectric profit-sharing trust. The area I want to focus on is the culpable claim to benefits and whether, under any scenario, Ms. Laird could prevail in a suit for benefits. The innocent participants here, and I know that the court asked the question, there were five participants, Colleen's mother and father, Frank Sr., May, Frank's uncle, Sam Perry, and Colleen, along with Frank Jr. What we know for sure, Colleen filed in 1999 and certified that the plan assets, as of September 1st through August 31st, were $561,590.87. That was by her own certification. Subsequently, by 2003, there were no monies left in there. As a breach of her produciary duty, which she essentially pled guilty to in filing a false return, the innocent participants here are entitled to recover not only restitution, but the lost opportunity cost, the return on investment, and if you just look at the other $234,000 that is somehow not accounted for in the 561 number of 1999, and do just a basic rate of return, whether you take the Dow Jones Industrial Averages, which averaged 6% a year, or you take CDs, these participants, the innocent participants, were entitled to the benefit of that, and 29 U.S.C. section 1109 specifically says that her restitution is not just limited to the face amount, otherwise this would incentivize people committing fraud to say 18 years later, oh, here's the base amount that I owe you. And so let's look at what happened to the innocent participants in this plan. First of all, the only two trustees remaining of the plan in June of 2017 when she filed the action against the plan were her parents, and somehow she didn't name her parents in the lawsuit. She named her brother-in-law, I mean her brother, excuse me, who was not a trustee, who was an officer of Perry Electric, the actual corporation. So if we just do some basic math here, we can see that at the time she filed the complaint, even if you give her credit for the 326, she still owed $913,000, 34 cents, $34, to the plan in restitution and lost opportunity costs. Now, did Sam Perry, who retired in 2004, did he ever get any money? No, because by 2004, all the money was drained out. Has Frank Jr. ever realized any of his benefits? No. He applied the money to the corporation to try and save it because she also embezzled $1.2 million, as it was determined, from the corporation. So he's scrambling, trying to save the corporation, paying suppliers, and inevitably, the corporation goes under also. And in 2020, it files for dissolution, never having been truly compensated as an innocent participant. And I think the inescapable conclusion here is that Colleen, the appellant, is trying to leapfrog over innocent participants in this plan to try and establish what I call a springing reinvestment. When the money was drained out in 2003, she took a full distribution. The effect of that full distribution was that she had no further rights in the plan, and now she's trying to say, by virtue of a payment that was supposedly misdirected, that now she has a springing reinvestment in the plan. I don't think there's any law to support that proposition, and I don't think under any circumstances she's ever going to prove that she could prevail in this case. And for that reason, I think Judge Shub's decision was correct, and I think the judgment should be affirmed. Thank you, Your Honor. Thank you, Counsel. We'll hear rebuttal. Thank you, Judge. I just want to make a few points on rebuttal, and I want to start with where Mr. Scalia left off and who the innocent participants are. And he's absolutely right that Ms. Lear was not the only person who suffered as a result of Perry Electric's misuse of the plan assets. And he's absolutely right that if the $326,000 had gone back into the plan as it should have, then there are other individuals like Sam Perry and like Frank Jr. himself who have vested interests and who would get that money back. I also want to touch on something that Mr. Larson discussed, which was what the exact number is that was supposedly in the plan. He says that the Gilbert Report shows one number, the Form 550 shows another number, and this goes to Judge Bennett's point that it's just a disputed fact that needs to go to a jury and that was inappropriate on summary judgment. I also want to briefly touch on the Parker v. Bain case. And that case is important because it's, as the district court says, controls its entire analysis on standing. But it's wrong because in that case, there was no argument that the vested interest had returned because Mr. Parker, in that case, had never put money back into the plan that he had taken from the plan. The difference is, and I'm curious on your take on this, is that there still hasn't been money placed back in the plan. And your view, of course, is it should have been. But how does that get you standing when it hasn't been? Well, because if it was returned, if it was— I think you have to live through all the analysis. Right. I think that's part of it. In Ms. Lair's control, she's given the money back to where it should have been. It was Perry Electric who is now not putting that money back in. And I'd just say that ERISA's statutory language uses the term may become eligible, which denotes something in the future that shows that you can get this vested interest back if you somehow do lose it. With my remaining minute, I just want to mention the Landwehr case, and that's the Dover case. And so in that case, Mr. Landwehr had no idea where this money came from. It turns out that his boss had given it to him from the ERISA retirement plan. And he said, well, I don't know where it came from. I'm just the innocent payee, and so I get to keep it. And this court said that you do not get to keep a windfall. And it doesn't matter whether you knew where it came from or not. If it's a plan asset, it's a plan asset.  Well, thank you, counsel. Thank you for your pro bono representation and for traveling out here to argue. It has been a great assistance to the court. My pleasure. Thank you. Thank you. The case has argued to be submitted for decision. Thank you all for your arguments.
judges: THOMAS, BENNETT, SUNG